616 F.2d 422
 Tyrone PRICE, Plaintiff,
v.
ZIM ISRAEL NAVIGATION CO., LTD., a corporation, Defendant.
ZIM ISRAEL NAVIGATION CO., LTD., a corporation, Third Party
Plaintiff-Appellee,
v.
TOKIO MARINE & FIRE INSURANCE COMPANY, LTD., a corporation,
Third Party Defendant-Appellant.
 No. 78-1604.
 United States Court of Appeals,
Ninth Circuit.
 April 3, 1980.
 
 Richard F. Runkle, Shield & Smith, Los Angeles, Cal., for Tokio Marine & Fire Ins. Co.
 Kenneth R. Chiate, Lilick, McHose & Charles, Los Angeles, Cal., for Zim Israel Navigation.
 Appeal from the United States District Court for the Central District of California.
 Before WRIGHT and SNEED, Circuit Judges, and FITZGERALD,* District Judge.
 SNEED, Circuit Judge:
 
 
 1
 In a world in which dwell injured longshoremen, their stevedore employers, shipowners, and maritime insurance companies, this case between a shipowner and insurance company arises. The shipowner won below, the insurance company brought this appeal, and we affirm.
 
 
 2
 The district court held appellant, Tokio Marine & Fire Insurance Company (Tokio), liable to appellee, Zim Israel Navigation Company (Zim), under an insurance policy issued by Tokio which named Zim as an additional insured. Suit was brought after Tokio refused to assume responsibility for a suit brought against Zim by a longshoreman injured while performing stevedoring operations aboard a Zim vessel. Tokio contended that it had no contractual obligation to Zim under the insurance policy and that such a contractual obligation would in any event be void under section 18 of the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, 33 U.S.C. § 905(b) (1976). The district court rejected both contentions and ordered Tokio to reimburse Zim, and Tokio has appealed. We agree with the district court.
 
 I.
 
 3
 Zim, an Israeli corporation which transports cargo between ports throughout the world by means of cargo vessels, entered into a contract on April 4, 1972 with International Transportation Service (ITS), a stevedoring company. Paragraph 9.4 of the contract provided that Zim would "defend, indemnify and hold harmless" ITS against any claims, losses, or expenses arising from Zim's negligence or from unseaworthiness or substandard conditions of Zim's vessels or equipment.[1] Paragraph 9.6 provided that Zim would be named as a coinsured under ITS's liability insurance policies.[2]
 
 
 4
 On May 11, 1973, Tokio, a Japanese corporation with its principal place of business in California, issued to ITS a comprehensive liability insurance policy, effective through May 1976. Six months after the issuance of this policy, on November 16, 1973, an endorsement was added at the request of ITS including Zim "as an additional insured as respects operations performed for Zim . . . ." The endorsement was typewritten on a printed form providing that all other terms and conditions remained unchanged.
 
 
 5
 No additional premium was paid for this endorsement at the time it was added to the policy. In 1974, however, Zim and ITS agreed that paragraph 9.6 of the stevedoring contract, the provision naming Zim as a coinsured, should be eliminated because ITS's insurance premium would be substantially increased as a result of the coverage extended to Zim. In a subsequent stevedoring contract executed by Zim and ITS on August 1, 1974, paragraph 9.6 was omitted. Paragraph 9.4, the indemnification provision, was retained. The November 16, 1973 endorsement was not explicitly cancelled.
 
 
 6
 A longshoreman, Tyrone Price, was injured while working for ITS aboard a Zim vessel in January 1975. A month later, Price filed suit against Zim, alleging negligence and strict liability in tort. In September 1975, Zim tendered the defense of the action to Tokio. Although a year earlier Tokio had accepted the defense of a personal injury suit brought by a longshoreman injured while working on a Zim vessel. Tokio refused to defend the Price suit on the grounds that the suit was not within the policy's coverage and that in any event the Zim endorsement had been cancelled. Zim then brought this action against Tokio. In due course the Price suit resulted in a settlement which all parties accept as fair. On the basis of stipulated facts, the district court entered judgment directing Tokio to reimburse Zim for the amount of the Price settlement and for its legal fees and costs. Tokio appeals from that judgment.
 
 
 7
 Two questions are before us on this appeal: Was Tokio obligated under the insurance policy to assume responsibility for the Price suit?[3] And was the Zim endorsement void under 33 U.S.C. § 905(b) (1976)? We answer the first yes and the second no.
 
 II.
 
 8
 Tokio maintains that Price's suit against Zim was not within the coverage of the insurance policy. The Zim endorsement extended the policy's coverage to Zim "as respects operations performed for Zim . . .," presumably by ITS. Since Price was an ITS employee and was injured aboard a Zim vessel while ITS was engaged in stevedoring operations for Zim, the endorsement appears to provide the coverage upon which Zim insists. However, Tokio argues that the endorsement was applicable only if ITS operations were the legal source, not merely the factual context, of Zim's liability. Thus, Zim would be insured against a suit alleging that Zim was vicariously liable for the acts of ITS. However, where Zim was directly liable for an injury, as in this case, the endorsement would not apply; the fact that the injury occurred during ITS operations would merely be coincidental.
 
 
 9
 Tokio insists that this interpretation of the endorsement is necessary to avoid rendering meaningless paragraph 9.4 of the stevedoring contract, by which Zim agreed to indemnify and hold harmless ITS against all claims arising from Zim's negligence or from the unseaworthiness of Zim's vessels or equipment. We disagree. This paragraph has its purposive roots in prior law. Before the enactment of 33 U.S.C. § 905(b) in 1972, so-called Ryan triangle suits,[4] in which injured longshoremen sued shipowners who in turn sued the longshoremen's employers for contribution or indemnity, were quite common. See Robertson, Shipowner Negligence and Stevedore Immunities under the 1972 Amendments to the Longshoremen's Act, 28 Mercer L.Rev. 515, 537 (1977). Paragraph 9.4 was addressed to this situation. It protected ITS from such third party suits by Zim. In return, Zim was protected by paragraph 9.6, which provided that Zim would be covered by ITS's liability insurance. The two paragraphs thus established a mutually satisfactory way of disposing of claims by injured longshoremen. By providing for a single insurer, paragraph 9.6 reduced the possibility of litigation regarding the application of paragraph 9.4. By contrast, it seems improbable that the parties would have intended that ITS obtain insurance which would not cover the common Ryan triangle suits but would be applicable only in less likely instances of acts by ITS for which Zim was vicariously liable.
 
 
 10
 Moreover, Tokio's construction, although plausible, is not the most natural reading of the language of the endorsement. The most that Tokio has shown is that the endorsement is ambiguous. Under standard principles for construing insurance policies, we must resolve ambiguities in favor of Zim, the insured. Gray v. Zurich Insurance Co., 65 Cal.2d 263, 269, 54 Cal.Rptr. 104, 419 P.2d 168 (1966); 13 Appleman, Insurance Law and Practice § 7386 (1976).
 
 
 11
 Tokio also contends that its contract is inapplicable to the Price suit because of an exclusion which provided that "(t)his insurance does not apply . . . to bodily injury . . . arising out of the ownership, maintenance, operation, use, loading or unloading of . . . any watercraft owned or operated by . . . any insured, . . . but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the named insured; . . ."[5] Noting that the policy twice uses the term "vessel" in its typewritten description of the hazards covered, Zim contends that the term "watercraft" in the policy denotes a small boat and that the "watercraft" exclusion does not apply to a larger "vessel," such as the one on which Price was injured. Although this construction may seem strained, the paramount principle of insurance policy construction is that a policy should be interpreted to give effect to the intention of the parties. Healy Tippits Construction Co. v. Employers' Surplus Lines Insurance Co., 72 Cal.App.3d 741, 748, 140 Cal.Rptr. 375 (1977); 13 Appleman, supra, § 7385. In ascertaining that intention, an endorsement normally prevails over inconsistent provisions of the policy. 13A Appleman, supra, § 7537 at 146. In this case it is stipulated that Tokio knew at the time it issued the endorsement that ITS performed stevedoring work on Zim vessels. The purpose of the endorsement, we believe, was to extend insurance coverage to Zim with respect to these operations. However, to give the watercraft exclusion the effect upon which Tokio insists would deny coverage for such operations both to Zim and to ITS. Thus, we conclude that the watercraft exclusion did not operate to relieve Tokio of its contractual obligation with respect to the Price suit.
 
 
 12
 This is consistent with California case law. In O'Neill v. Caledonian Insurance Co., 166 Cal. 310, 135 P. 1121 (1913), for example, a written clause in a fire insurance policy covering an "auto repair shop" was held to prevail over a printed clause suspending coverage if more than one quart of gasoline were kept on the premises. "(I)t must be presumed," the court wrote, "that the company undertook to insure against all risks incident to the conduct of that business when carried on in the usual manner." Id. at 314, 135 P. at 1122. See also Yoch v. Home Mutual Insurance Co., 111 Cal. 503, 44 P. 189 (1896).
 
 
 13
 Tokio relies upon Oakland Stadium v. Underwriters at Lloyd's, 152 Cal.App.2d 292, 313 P.2d 602 (1957), in which the court held that Oakland Stadium, despite being named as an additional insured in a liability policy issued to a racing association, was not covered with respect to a racing injury because of an exclusion in the policy for owners or operators of a racetrack or stadium. The court observed that there was nothing in the policy to indicate that the Stadium owned and operated a racetrack, and concluded that "in the absence of anything other than the request to add the additional name, the effect of adding the name confers upon the additional assured only such benefit as under the terms of the policy he is entitled to receive." Id. at 299, 313 P.2d at 607 (emphasis added). By contrast, it is stipulated in this case that Tokio knew ITS performed stevedoring work on vessels owned by Zim. It is significant, moreover, that Tokio had accepted under the policy the defense of an earlier suit brought by a longshoreman injured aboard a Zim vessel, although the watercraft exclusion appears as applicable there as here.
 
 
 14
 Acts of the parties, subsequent to the execution of the contract and before any controversy has arisen as to its effect, may be looked to in determining what the parties meant by their acts. The conduct of the parties may be, in effect, a practical construction of what they intended.
 
 
 15
 Spott Electrical Co. v. Industrial Indemnity Co., 30 Cal.App.3d 797, 808, 106 Cal.Rptr. 710, 718 (1973).
 
 
 16
 Finally, Tokio contends that the Zim endorsement had been cancelled before Price was injured. Cancellation may be accomplished in several ways. The policy permitted Tokio to cancel the policy by giving timely notice to the "named insured"; similarly, ITS could cancel by giving notice or surrendering the policy to Tokio. In addition, an insured may also cancel an insurance policy by means of a definite and unconditional request actually communicated to the insurer. Knox-Seeman Motor Parts, Inc. v. American Insurance Co., 2 Cal.App.3d 173, 179, 82 Cal.Rptr. 451 (1969). It is stipulated, however, that Tokio notified neither Zim nor ITS that the Zim endorsement had been cancelled, and the record does not indicate that either ITS or Zim gave notice of cancellation to Tokio. Hence, whatever the parties' subjective intentions may have been, the steps necessary to effect cancellation of the policy were not taken. Cf. Glens Falls Insurance Co. v. Founders' Insurance Co., 209 Cal.App.2d 157, 25 Cal.Rptr. 753 (1962).
 
 
 17
 Tokio argues that by deleting paragraph 9.6 from the stevedoring contract, and thus relieving ITS of its obligation to obtain insurance for Zim, ITS and Zim effected "constructive cancellation" of the Zim endorsement. We have found no support in California case law for Tokio's notion of "constructive cancellation." Tokio's obligations were governed by the insurance policy which it issued, not by the stevedoring contract to which it was not a party. We should be reluctant to depart from this principle in interpreting maritime insurance policies.
 
 
 18
 We conclude, therefore, that under the terms of the policy and the Zim endorsement, Tokio was obligated to assume responsibility for the Price suit.
 
 III.
 
 19
 In 1972, Congress amended the Longshoremen's and Harbor Workers' Compensation Act to provide, in pertinent part:
 
 
 20
 In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void . . .
 
 
 21
 33 U.S.C. § 905(b) (1976) (emphasis added). The district court concluded that this provision was inapplicable to this case because the shipowner's suit was against Tokio, not against ITS, the stevedore. Tokio argues that the Zim endorsement, which was obtained pursuant to paragraph 9.6 of the stevedoring contract requiring ITS to obtain insurance for Zim, was an agreement making ITS indirectly liable for injuries covered by section 905(b) and hence was void. To uphold a contract requiring a stevedore to obtain insurance for a shipowner, Tokio maintains, would nullify the statutory proscription of liability which is indirect.
 
 
 22
 We disagree. An examination of the legislative history of section 905(b) suggests that Congress' purpose in prohibiting both direct and indirect liability of stevedores to vessels was to foreclose all theories under which Ryan triangle suits might be brought rather than to prevent insurance arrangements such as before us. Before the enactment of section 905(b), shipowners had sued stevedores in contract for indemnification on the basis of express or implied warranties of workmanlike performance, and also for contribution on the theory that stevedores were joint tortfeasors. Under the contract theory, a stevedore was liable for breach of a duty owed directly to the vessel. Under the tort theory, a stevedore owed a duty directly to the longshoreman; hence, its liability to the vessel was indirect. By prohibiting both direct and indirect liability, Congress precluded liability under either theory. Thus, the House Labor and Education Committee explained: "It is the Committee's intention to prohibit such recovery (of a vessel against an employer) under any theory including, without limitation, theories based on contract or tort." H.R.Rep. No. 92-1441, 92nd Cong., 2d Sess. 7, reprinted in (1972) U.S.Code Cong. & Admin.News pp. 4698, 4704.
 
 
 23
 Indeed, it seems that Congress considered any recovery won by a vessel against a stevedore, even in a suit based on a theory of contract, to create a form of indirect liability, since such a recovery forced the stevedore indirectly to compensate the injured longshoreman despite 33 U.S.C. § 905(a) (1976) (codified prior to 1972 as 33 U.S.C. § 905), which limits the longshoreman's remedies to those provided in the statute. Thus, after summarizing Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), which made stevedores liable under a breach of warranty theory, the House Report stated:
 
 
 24
 The end result is that despite the provision in the Act which limits an employer's liability to the compensation and medical benefits provided in the Act, a stevedore-employer is indirectly liable for damages to an injured longshoreman who utilizes the technique of suing the vessel under the unseaworthiness doctrine.
 
 
 25
 H.R.Rep. No. 92-1441, supra, at 5 (1972) U.S.Code Cong. & Admin.News at p. 4702 (emphasis added).
 
 
 26
 The legislative history of section 905(b), therefore, does not support the construction suggested by Tokio. Nor is such a construction required by the policies reflected in the section. The House Report stressed that the decisions permitting vessels to sue stevedores had generated substantial litigation and that "financial resources which could better be utilized to pay improved compensation benefits (are) now being spent to defray litigation costs." Id. at 5 (1972) U.S.Code Cong. & Admin.News at p. 4702. See also Bloomer v. Liberty Mutual Insurance Co., --- U.S. ----, ----, 100 S.Ct. 925, 935, 63 L.Ed.2d 215, 229, (1980). The 1972 amendments were intended to eliminate such third party litigation. The accomplishment of this end does not require that the November 16, 1973 endorsement be nullified.
 
 
 27
 Moreover, insurance procurement provisions such as paragraph 9.6 do not make ITS indirectly liable to Zim's vessel. The purpose of such provisions may well be merely to allocate initially the burden of procuring insurance. The economic burden of the premiums can be allocated as the parties wish. Zim, for example, in this case may well have borne that burden by paying more for ITS's services. Or ITS may have absorbed the cost. Either way, no violation of section 905(b) was involved.
 
 
 28
 We conclude that Tokio's contractual obligation to assume responsibility for the Price suit was not void under section 905(b). The judgment of the district court is therefore affirmed.
 
 
 29
 Affirmed.
 
 
 
 *
 Honorable James M. Fitzgerald, United States District Judge for the District of Alaska, sitting by designation
 
 
 [1]
 Paragraph 9.4 of the contract, which referred to Zim as "Line" and to ITS as "Terminal," provided:
 
 
 [9]
 4 Line shall defend, indemnify and hold harmless Terminal against any and all claims, demands, penalties, disputes or actions, and from any and all loss, costs, expenses and fees in connection therewith, arising out of or resulting in all or in part from:
 a) Unseaworthiness of Line's vessels, equipment or materials.
 b) Failure of Line's vessels, equipment or materials or other aspects of the work environment provided by Line to meet applicable Governmental safety or environmental protection standards, or
 c) The negligence or the fault of Line or Line's agents, employees, servants or independent contractors, or the masters, officers, or crew of containerships in Line's service or of labor provided hereunder.
 
 
 [2]
 Paragraph 9.6 provided:
 
 
 [9]
 6 Line will be named as co-insured under Terminal's existing Comprehensive General Liability Policy, Stevedores and Warehousemen's Liability Policy as Line's interest may appear. Terminal shall furnish Line with satisfactory evidence of such co-insurance arrangements
 
 
 [3]
 Both the parties and the district court assumed without discussion that the insurance contract should be governed by California law, and we do not disturb that assumption. See Kalmbach, Inc. v. Insurance Co., 529 F.2d 552 (9th Cir. 1976); Wilburn Boat Co. v. Fireman's Fund Insurance Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955)
 
 
 [4]
 The name derives from the Supreme Court's decision in Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), allowing a shipowner to seek indemnification from a stevedore for damages paid to an injured longshoreman
 
 
 [5]
 The full text of the watercraft exclusion is as follows:
 This insurance does not apply:
 (e) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of
 (1) any watercraft owned or operated by or rented or loaned to any insured, or
 (2) any other watercraft operated by any person in the course of his employment by any insured;
 but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the named insured: . . .