USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 96-1718 FIREMAN'S FUND INSURANCE COMPANIES, Plaintiff, Appellant, v. AMERICAN INTERNATIONAL INSURANCE COMPANY OF PUERTO RICO, INC., Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jaime Pieras, II, U.S. District Judge] ___________________ ____________________ Before Coffin and Campbell, Senior Circuit Judges, _____________________ and DiClerico,* District Judge. ______________ ____________________ Timothy J. Armstrong with whom Alvaro L. Mejer was on brief for _____________________ _______________ appellant. Francisco E. Colon-Ramirez with whom Francisco J. Colon-Pagan was __________________________ ________________________ on brief for appellee. ____________________ March 20, 1997 ____________________  ____________________ *Of the District of New Hampshire, sitting by designation. COFFIN, Senior Circuit Judge. This appeal concerns the _____________________ scope of insurance coverage for the loss at sea of 19 containers en route from Puerto Rico to Miami.1 The disputing parties are the two insurance companies that maintained insurance policies covering the shipper, Sea Barge, and the cargo-handling stevedore, Ayala. Fireman's Fund, which provided an insurance policy to Sea Barge, defended Sea Barge and Ayala in multi- district litigation resulting from the loss, and then sought to compel AIICO, Ayala's insurer, to reimburse it for settlement and litigation costs. The district court found that AIICO's policy did not cover the type of risk at issue here, and therefore granted summary judgment for AIICO. Although our analysis differs in some details from that of the district court, we approve its general approach and ruling, and therefore affirm. FACTS _____ In 1985, three companies, Ayala, Maduro, and Zapata, joined together to form a barge service named Sea Barge, to operate between Puerto Rico and Miami. Ayala and Maduro were stevedores: Ayala's operations were in Puerto Rico; Maduro's were in Miami. Zapata provided tug and barge services. Pursuant to the Shareholders' Agreement, Ayala, Maduro and Zapata agreed to  ____________________ 1 As the full names of the relevant entities in this case are somewhat unwieldy, each will be referred to by the following abbreviations: Fireman's Fund Insurance Companies ("Fireman's Fund"); American International Insurance Company of Puerto Rico, Inc. ("AIICO"); Marine Transportation Services Sea Barge Group, Inc. ("Sea Barge"); Luis Ayala Colon & Sucesores, Inc. ("Ayala"); Zapata Gulf Marine Corporation ("Zapata"); and S.E.L. Maduro (Florida), Inc. ("Maduro").  -2- cooperate in assisting Sea Barge to obtain cargo and cargo legal liability insurance, as well as container and chassis damage insurance. They further agreed that each policy would name all parties as additional insureds as well as Sea Barge. Ayala and Maduro also agreed to obtain liability insurance covering stevedoring services provided to Sea Barge.  Under a separate Stevedoring Agreement executed between Sea Barge and Ayala, Ayala agreed to maintain public liability and property damage insurance covering Ayala's liability for bodily injury and property damage sustained by third parties arising out of its stevedoring operations. In October 1987, AIICO issued a comprehensive general liability policy (the "MultiPeril Policy") to Ayala, covering personal injury and property damage. A separate policy covered warehousing and stevedoring. In July 1988, Fireman's Fund issued a Marine Policy package to Sea Barge; this included a legal liability policy, covering Sea Barge's legal liability for physical loss or damage to goods and/or merchandise.2  On December 16, 1988, Sea Barge's Barge 101 set off on its ill-fated journey. It encountered rough weather at sea, and 19 containers were lost. Seven lawsuits were filed by cargo claimants; of these, all named Sea Barge as defendant, but only  ____________________ 2 The Fireman's Fund policy identified Sea Barge as the named assured, and Ayala, Zapata, and Maduro as additional insureds "solely with respect to their activities" under the Shareholders Agreement. The policy also stated that it excluded coverage for damages collectible under the Assured's General Liability Policy and/or recovery under any other primary policy of the assured.  -3- one also named Ayala as a defendant.3 Fireman's Fund, which defended Sea Barge and Ayala in the ensuing multi-district litigation, subsequently sought contribution and indemnity from AIICO.4 AIICO refused, contending the loss was not covered by its policy because the incident occurred during Sea Barge's segment of the transportation endeavor, rather than during Ayala's. The district court granted summary judgment for AIICO, concluding, largely on the basis of two exclusions contained in the AIICO policy (the watercraft exclusion and the policy territory exclusion), that the loss which occurred was not the type insured against by the AIICO policy. It therefore did not reach the second issue raised by the parties as to which of the two policies was primary. This appeal followed. DISCUSSION __________ Our review of the district court's grant of summary judgement in AIICO's favor is de novo. Velez-Gomez v. SMA Life __ ____ ___________ ________ Assur. Co., 8 F.3d 873, 875 (1st Cir. 1993). Since the __________ construction of an insurance policy is a question of law, we must make our own independent examination of the policy. Nieves v. ______ Intercontinental Life Ins. Co. of Puerto Rico, 964 F.2d 60, 63 _____________________________________________ (1st Cir. 1992).   ____________________ 3 The cases, five of which were filed in Florida and two of which were filed in Puerto Rico, were consolidated and transferred to the District of Puerto Rico. 4 Fireman's Fund had previously requested AIICO's participation in the defense during the pre-trial phase of the multi-district litigation; however, this request was rejected by AIICO.  -4- Our analysis of the issue is potentially two-pronged: we consider first whether the loss was the type covered by or contemplated by the policies in question; and if so, we must determine which policy is primary. See Couch on Insurance 2d, ___ _____________________ sec. 62: 44, 45 (Rev. ed. 1983).  In addressing the first question, we turn to the language of the policy, supplementing this if necessary with evidence of the parties' intent, as demonstrated here in the Shareholders Agreement, the Stevedoring Agreement, and the various affidavits submitted. See Nieves, 964 F.2d at 63 (if wording of contract is ___ ______ explicit and language is clear, terms and conditions are binding on parties); U.S. Aviation v. Fitchburg-Leominster Flying Club, _____________ ________________________________ 42 F.3d 84, 86 (1st Cir. 1994) (determination of ambiguity of policy terms and resolution thereof are matters for the court).  The AIICO policy, as noted above, was a comprehensive general liability policy. This policy contained a number of relevant exclusions and endorsements modifying the policy. For the reasons we discuss below, these in the aggregate indicate that the loss sustained here was not the type the AIICO policy was intended to cover. However, while the district court based its grant of summary judgment largely on the watercraft and policy territory exclusions, we find several other terms in the AIICO policy more compelling, specifically those covering the definition of the "named insured" and "additional insured." We -5- first discuss briefly the grounds relied on by the district court.5  The watercraft exclusion, contained in Section II of the General Liability Insurance Coverage, provided: This insurance does not apply: [...]  (e) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of (1) any watercraft owned or operated by or rented or loaned to any insured, or (2) any other watercraft operated by any person in the course of his employment by any insured; but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the named insured. Fireman's Fund maintains that reading this provision to exclude coverage for Ayala's activities as a stevedore would render the insurance policy meaningless, as Ayala's activities were necessarily tied to loading and unloading Sea Barge vessels.  But reading this as effectively excluding stevedoring activities would not seem to us to contradict the general intent of the parties and Ayala's expressed intent not to duplicate insurance costs, for, as we have noted, AIICO issued a separate policy to Ayala covering warehousing and stevedoring. This fact also seems to distinguish this case from Price v. Zim Israel _____ __________  ____________________ 5 In our analysis, we are mindful that the terms in an insurance contract are to be given their plain meaning. Wickman _______ v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1084 (1st Cir. ____________________________ 1990). -6- Navigation Co., 616 F.2d 422 (9th Cir. 1980),6 principally relied ______________ on by appellant, for in Price applying the exclusion would have _____ resulted in avoidance of an obligation which the insurer had agreed to assume.7 In any event, we feel more comfortable relying on other grounds for our disposition.  We next turn to a second exclusion which the district court emphasized in its decision -- the Policy Territory Exclusion.  The applicable section of the Policy Territory Exclusion states: "policy territory" means: a. the Commonwealth of Puerto Rico, or b. international waters or air space, provided the bodily injury or property damage does not occur in the course of travel or transportation to or from any other country, ________ state or nation.... (emphasis added). _______________ AIICO makes much in its brief of the use of the term "state," contending that the intended meaning includes other states within the United States, rather than only contemplating foreign states. Again, we find this argument less than convincing. Black's Law Dictionary defines "state" as "either ... body politic of a nation ... or ... an individual  ____________________ 6 In Price, the Ninth Circuit held that a watercraft _____ exclusion similar to this one in a policy issued to a stevedore did not preclude coverage for injuries sustained by a longshoreman employed by the stevedore while working on the transport company's vessel. Price v. Zim Israel Navigation Co., _____ _________________________ 616 F.2d 422, 427 (9th Cir. 1980). The Price court reasoned that _____ construing the watercraft exclusion to preclude coverage for activities on the vessel would deny coverage to the stevedore and the cargo transport company, in violation of the purpose of the endorsement, which was to provide coverage for such operations to both companies. Id.  ___ 7 Additionally, Price is inapposite here, as an _____ endorsement to this policy specifically distinguishes between vessels above and under 26 feet in length. -7- governmental unit of such nation." Black's Law Dictionary 1407 ______________________ (6th ed. 1990). To interpret the policy exclusion to exclude coverage for accidents that occur between Florida and Puerto Rico as "states" creates a result that is perplexing at best, given the enterprise at hand. The district court's rationale was that coverage for incidents occurring in international waters was not intended at all under the AIICO policy, but rather that the endorsement was intended to restrict coverage to Puerto Rico itself, on the ground that coverage for the voyage and Florida portions was intended to be obtained by the companies actually engaged in each of those legs of the transportation operation, i.e., Sea Barge and Maduro, respectively. As with the watercraft ____ exclusion, we prefer not to rest our decision on this ground.  We therefore turn to the policy terms we do see as clearly indicating that the loss that occurred here was not contemplated under the AIICO policy, specifically Endorsements 1 and 13. Endorsement 1 of the AIICO policy, "Named Insured," provides that the named insured under the policy is Ayala "and/or any subsidiary, associated, affiliated, newly acquired, or controlled corporation and/or company as may now be constituted or hereafter formed, and over which the named insured maintains ownership or majority interest." Fireman's Fund maintains that Sea Barge falls within the category of companies covered due to Ayala's "ownership interest" in Sea Barge. However, the facts do not support this assertion: Ayala owned only 20% of the outstanding -8- shares of Sea Barge stock, which can be seen as neither ownership nor a majority interest. Endorsement 13 of the AIICO policy, "Additional Insured," lends additional credence to the view that the occurrence in question was not intended to be covered by the policy. This endorsement states that:  the unqualified word 'insured' also includes the below mentioned entities, but only with respect to their liability arising out of operations performed by the named insured.  Such coverage as is afforded under this clause shall only apply when contract conditions between the named insured and their principals so stipulate and then only insofar as is necessary to meet the requirements of such contract conditions.   The list following this statement includes Sea Barge, as well as nine other companies. It strains credulity to suggest that Ayala, or AIICO, intended all ten companies listed (including Sea Barge) to thereby gain unlimited coverage under the policy; rather, coverage is specifically limited to that required by contracts between those listed and Ayala. While Fireman's Fund maintains that the contract in question between Ayala and Sea Barge must be the Shareholders' Agreement, we conclude that the contracts the endorsement anticipates are discrete contracts between Ayala and the listed companies. Therefore, here the relevant contract must be the stevedoring contract between Ayala and Sea Barge. To read the endorsement otherwise overlooks both logic and the language of the endorsement.  Our conclusion that straightforward construction of the policy's terms indicates that the loss that occurred was not -9- contemplated as a covered one is further buttressed by our examination of the parties' intent, as evidenced by key documents and by sworn testimony. See In re San Juan DuPont Plaza Hotel ___ _________________________________ Fire Litig., 802 F.Supp. 624, 637 (D.P.R. 1992), aff'd, 989 F.2d ___________ _____ 26 (1st Cir. 1993) (terms of policy must be interpreted according to parties' purpose and intent).  As noted above, the two major documents in this case are the original Shareholders' Agreement, and the stevedoring contract between Sea Barge and Ayala. The Shareholders' Agreement creates an interlocking structure of responsibility for the three forming companies, with the duties of each clearly specified. In general, these duties are distinct -- Ayala was to handle Puerto Rico-based stevedoring activities, Zapata those relating to the tugs and barges, and Maduro the Florida-based activities.  Article II, section 2.02(vi) of the Agreement stipulates that all parties shall cooperate with Sea Barge in obtaining cargo and cargo legal liability insurance, and that each policy will name all parties, in addition to Sea Barge, as additional insureds.8  Both Lemuel Toledo Campos, the insurance broker who advised Ayala, and Hernan F. Ayala-Parsi, the executive vice president of Ayala, stated in their affidavits that the intent of the insurance provisions in the Shareholders' Agreement was to avoid duplication of insurance costs by preventing any concurrent coverage. Ayala-Parsi also stated that the parties' intent in  ____________________ 8 Ayala and Maduro were required under section 2.02(vii) to obtain separate liability insurance covering their stevedoring activities as provided to Sea Barge. -10- the Agreement was that losses at sea were to be covered by Sea Barge's insurance, and that the AIICO policy's terms were consistent with this intent.  The Stevedoring Agreement, the other major document here, is narrowly directed at structuring the stevedoring relationship between Sea Barge and Ayala. Insofar as it addresses insurance coverage, it provides that Ayala will maintain worker's compensation insurance, as well as public liability insurance and property damage insurance "arising out of operations performed hereto." It further contains a limitation of liability clause providing that Sea Barge shall indemnify and hold harmless Ayala for any losses due to unseaworthiness or negligence of Sea Barge employees, and limiting Ayala's liability to losses caused by its own negligence, and then only as a stevedore and not as a bailee.9 The Agreement therefore appears to create a relationship between Ayala and Sea Barge under which Ayala's responsibilities to maintain insurance and its liability are narrowly circumscribed.  Indeed, it is apparent from the testimony presented that AIICO and Ayala, the parties to the insurance policy in question, understood and intended that the AIICO policy would not extend to Sea Barge's activities other than in the limited circumstances  ____________________ 9 Additionally, Article XIV of the Stevedoring Agreement, the Custody Clause, provides that Sea Barge would be responsible for goods from the time they were received by it at the terminal facilities at the port of loading until they were delivered or dispatched from the port of unloading.  -11- set forth in the Stevedoring Agreement.10 Toledo Campos stated that the scope of Endorsement 1 of the AIICO policy was intended to include only those companies Ayala fully owned or held a majority interest in, and that the coverage of Sea Barge and the other companies listed in Endorsement 13 was limited to that required by contracts between the listed parties and Ayala.  Ulises Seijo, a general adjuster for AIICO, confirmed in his affidavit that Endorsement 1 applies only to those companies which Ayala owned or had a majority interest in, and he specifically stated, "It [the endorsement] does not apply to Sea Barge."  Having reached the conclusion that the loss which occurred was not of the type covered or intended to be covered by the AIICO policy, we do not reach the second prong of the analysis noted above as to which policy is primary, and may draw our efforts to a close at this point. We therefore affirm the district court. CONCLUSION __________ As the loss at sea of the nineteen containers was not within the purview of the coverage provided by the AIICO policy, we conclude that the district court correctly granted summary judgment for AIICO.  Affirmed.  ________  ____________________ 10 No testimony to the contrary has been brought to our attention.  -12-