Andrew VOISON

v.

O.D.E.C.O. DRILLING, INC.

v.

RIG HAMMERS, INC.

Civ. A. No. B–81–120–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

Dec. 10, 1982.

---

Richard C. Hile, Tonahill, Hile & Leister, Jasper, Tex., for plaintiff.

James Patrick Cooney, Royston, Rayzor, Vickery & Williams, Houston, Tex., for defendant.

L. Keith Slade, Weitinger, Steelhammer & Tucker, Houston, Tex., for third-party defendant.

## MEMORANDUM OPINION

JOE J. FISHER, District Judge.

The plaintiff, Andrew Voison, was an employee of third-party defendant Rig Hammers. When injured, he was supervisor of a casing crew working aboard the OCEAN PRIDE, a jackup drilling rig, off the coast of Texas. The OCEAN PRIDE was owned by defendant O.D.E.C.O. Drilling, Inc. (Odeco). Both Odeco and Voison's employer, Rig Hammers, were working for Shell Oil Co. under separate contracts. Odeco employees manned the rig; they served as its crew and also drilled the wells. The employees of Rig Hammers were on board Ode-

co's vessel in order to drive conductor pipe so that drilling could begin.

Voison was injured while helping the crew of the OCEAN PRIDE. Voison had been asked by the Odeco driller to help him operate a wrapping drum winch (commonly called a cathead) on the rig's drawworks. They were using the winch to secure conductor pipe which the crew was stacking in the derrick.

The Odeco drilling crew and the Rig Hammers casing crew were working together in the preparatory welding of pipe into eighty foot sections before hammering began. Odeco's tool pusher had only one experienced roughneck available to assist in the stacking of the pipe—the other Odeco crewmen being "green," or inexperienced— so he gratefully accepted Voison's assistance. Voison was operating the cathead winch, which was being used to hoist the one experienced roughneck in the Odeco crew up into the derrick. The winch line supported the roughneck as he chained off the conductor pipe aloft.

The cathead is a quaint form of wrapping drum winch that rotates whenever the drawworks master clutch is engaged. The winch is actually a drum around which one wraps a large diameter (c. 1½″) rope. By controlling the degree of friction between rope and drum, i.e., by either increasing or reducing the number of wraps around the drum or the hand-held tension on the rope, a skilled operator can lift or lower relatively light loads via the catline.

Voison was hoisting the roughneck, who was already aloft in the derrick, when a kinked or unraveled section of rope was pulled onto the drum. The flaw in the rope caused it to jump out of the guide on the drum so that the rope began to wind over the adjacent turns instead of beside them. Voison had to act quickly lest the roughneck be hauled into the block above or forced to jump in order to save himself. When Voison tried to right the dangerous condition, his glove got caught between the turns of the rope. Voison was turned head over heels three or more times by the cathead with which he was entwined. The tool pusher finally disengaged the drawworks clutch, applied the inertia brake, and rescued Voison.

Voison received workman's compensation benefits from Rig Hammers. He sued Odeco alleging that its negligence caused his injury. Odeco then sued Rig Hammers as a third party defendant, seeking indemnity under the Odeco Master Service Contract. Odeco also sought recovery from Rig Hammers for the alleged breach of a contractual requirement that Rig Hammers name Odeco as an additional assured in Rig Hammers' insurance policies.

■ The evidence is undisputed; that the catline rope was flawed, that the tool pusher was not standing in a place where he could safely stop the drawworks at the onset of the accident, and that the drilling crew of the OCEAN PRIDE was undermanned and inexperienced. Voison argues that these conditions were the cause of his injury and that Odeco's vessel was negligent in allowing them to exist.

The court therefore finds as fact that those conditions described above were the proximate cause of Voison's injury. Moreover, the court concludes that, in allowing these conditions to exist aboard the OCEAN PRIDE, Odeco negligently failed to provide a safe place to work.

On the day of the trial, Voison and Odeco announced their settlement of Voison's negligence claim against Odeco for $75,000. This sum was exclusive of the compensation lien for the benefits that Rig Hammers had paid to Voison. The settling parties agreed that this was a fair, reasonable, and adequate payment to Voison by Odeco for the injuries he suffered on the OCEAN PRIDE.

The court then heard testimony and received evidence on the issues of:

A. Voison's status as a seaman or maritime worker protected by the Longshoremen and Harborworkers' Compensation Act, 33 U.S.C. § 901 *et seq.* (1976);

B. Rig Hammers' allegation that Voison was Odeco's borrowed servant;

C. Rig Hammers' indemnity obligation to Odeco pursuant to the Master Service Contract;

D. The obligation of Rig Hammers to provide insurance coverage for Odeco;

E. The reasonableness of the settlement amount and recovery upon the compensation lien.

## A. SEAMAN OR MARITIME WORKER?

Odeco argued that Voison was a Jones Act seaman at the time of his injury on the basis of criteria set forth in *Offshore Company v. Robison,* 266 F.2d 769 (5th Cir.1959). *Robison* indicated that an offshore oil worker might qualify as a seaman if he be permanently assigned to a vessel and his duties contribute to the functioning of the vessel.

As the OCEAN PRIDE was a drilling vessel and Voison's duties directly concerned the drilling operations on board, the latter condition is met. Arguably, the fact that Voison had worked on board a number of vessels operated on behalf of Shell Oil Co. imbued his relationship with the OCEAN PRIDE with sufficient "permanency" to satisfy the former condition. *See Roberts v. Williams-McWilliams Co., Inc.,* 648 F.2d 255 (5th Cir.1981) (finding the permanency requirement met by assignment to a specific fleet of vessels).

Odeco argues that this simple inquiry suffices to determine an oil worker's status as a Jones Act seaman. Odeco's reliance on *Robison* however, is misplaced. The status of offshore oil workers has been more clearly defined since *Robison* was decided. Recent decisions have denied Jones Act seaman status to offshore oil workers, but have instead held them to be protected by other legislation.

■ It is now apparent that an oilfield specialty worker, injured while performing his duties on a drilling vessel, is a "maritime employee" for purposes of the Longshoremen and Harbor Workers' Compensation Act (hereinafter the Act), 33 U.S.C. §§ 901 *et seq.* (1976). *Boudreaux v. Ameri-*

*can Workover, Inc.,* 664 F.2d 463 (5th Cir. 1981) (rigger in a wireline crew injured onboard a drilling vessel in inland waters); Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356, especially § 1331(b) (1976).

■ The court holds that Voison, as the supervisor of a well casing crew on board a drilling vessel, was an oilfield specialty worker covered by the Act at the time of his injury.

## B. A BORROWED SERVANT?

■ The evidence showed that Voison was working alongside the other crewmen of the OCEAN PRIDE. He was operating equipment attached to the vessel and doing work that, had more experienced Odeco employees been available, might have been performed by OCEAN PRIDE crewmen. Rig Hammers urges the court to find that Voison was a borrowed servant, but that determination appears to be unjustified as well as unnecessary.

Calling Voison a borrowed servant of Odeco is unjustified because of the fact that both crews were working together to accomplish their respective goals. The crew of the OCEAN PRIDE was assisting the Rig Hammers' casing crew no less than the Rig Hammers' crew was assisting the OCEAN PRIDE's crew. Voison was no more the borrowed servant of Odeco than was the Odeco tool pusher the borrowed servant of Rig Hammers.

The court concludes that at the time of his injury aboard the OCEAN PRIDE Voison was not the borrowed servant of Odeco, but was rather in the employ and under the control of his employer, Rig Hammers.

## C. VALIDITY OF THE INDEMNITY AGREEMENT

Rig Hammers entered an "Odeco Master Service Contract" October 26, 1976 which, Odeco asserts, was in force at the time Voison's injury occurred. That contract contains a number of boiler plate clauses for the protection of Odeco. On its face the agreement controls and governs all activi-

ties of Rig Hammers that might involve Odeco. That is, not only does the contract apply when Rig Hammers is performing work under contract with Odeco, but it also obligates Rig Hammers "with respect to any work performed by Contractor [Rig Hammers] pursuant to contracts or work orders with parties other than Company [Odeco] on any drilling barges, vessels, platforms, installations, or other property of any kind owned by, leased to, chartered to, or under the control of Company ..." In particular, the above provision applies Sections 8, 9, 10 and 11 of the contract "with respect to work so performed." [1]

Rig Hammers was working on the OCEAN PRIDE pursuant to a contract with Shell Oil Co., not with Odeco. The vessel and her crew, however, belonged to Odeco. Those circumstances, Odeco claims, cause the Odeco Master Service Contract to control Rig Hammers' rights and obligations vis a vis Odeco in this case.

The court understands the usefulness of such open service contracts to the offshore drilling industry and the fact that they facilitate the provision of services under work orders that incorporate by reference the blanket boiler plate of the master contracts. The wisdom is not clear however, of attempting to obligate a contractor in circumstances when no contractual relationship otherwise exists between the parties.

The court attributes this peculiarity to the relative bargaining strength of the parties and assumes that Rig Hammers so valued its work orders from Odeco and its access to Odeco's rigs that it was willing to agree to indemnify and insure Odeco per the Contract. Without deciding the interesting question of consideration in this Contract, the court assumes, *arguendo,* that the Contract was in force when the cathead threw Voison for a loop.

Odeco seeks to force Rig Hammers to indemnify it for the $75,000 damages, beyond the compensation lien amount, that Odeco paid to Voison in settlement of Voison's negligence claim. Odeco also seeks to recover its attorney fees. Odeco relies on section 9 of the Odeco Master Service Contract which requires that Rig Hammers agree to indemnify and hold harmless Odeco from any and all claims arising from Rig Hammers' activities even though caused by the negligence of Odeco.[2]

Having found that Voison is a maritime worker entitled to protection under the Act, the court must necessarily afford to Voison's employer the protection of the Act. For the reasons discussed below, the court is convinced that section 9 of the Odeco Master Service Contract is in violation of the provisions of section 5 of the Act.

That section details the 1972 redefinition by Congress of the rights and duties between vessels, maritime workers, and their employers. Congress amended the Act in order to provide a fairer and more economically efficient system for paying the costs of the unfortunate but inevitable injuries incident to maritime employment.

The history of the 1972 amendments to the Act does not require discussion here. Other courts have explained the purpose and meaning of the amendments in suffi-

---

1. Section 8 specifies insurance coverage to be carried by Rig Hammers; section 9 obliges Rig Hammers to indemnify Odeco of any claims; section 10 waives any claim against Odeco for damages or destruction to Rig Hammers' property that is caused by Odeco; and section 11 requires that Rig Hammers report any accidents or injuries that occur to Odeco.

2. Section 9 purports to be an allocation of the risks between the parties with their intent being "to provide for indemnity to the maximum extent permitted by law and to support such indemnity by liability insurance coverage to be furnished by the indemnitor." Section 9 further provides that Rig Hammers "agrees to indemnify and hold harmless Company [Odeco] from and against ... any and all claims, demands, or actions for damages to persons and/or property ..., which may be brought against Company ... incident to, arising out of, in connection with, or resulting from the activities of Contractor [Rig Hammers] ... whether occasioned, brought about, or caused in whole or in part by the negligence of Company, ... or by unseaworthiness of any vessel ... or by any defective condition of equipment of Company, regardless of whether such negligence, unseaworthiness, or defective condition be active or passive, primary or secondary.

cient detail. *See, e.g., Scindia Steam Navigation Co. Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981); and *Pippen v. Shell Oil Co.,* 661 F.2d 378 (5th Cir.1981). Congress wrote that redefinition in remarkably clear language.

Section 5(a) of the Act specifies that "the liability of an employer prescribed in section 4 [33 U.S.C. § 904] shall be exclusive and in place of all other liability of such employer to the employee, ... [specified survivors], ..., and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death..." 33 U.S.C. § 905(a) (1976).

Section 905(b) provides that "In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person ... may bring an action against such vessel as a third party ..." The Act further commands that "the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements to the contrary shall be void." 33 U.S.C. § 905(b) (1976).

The explicit provision was included in the Act, the court believes, to nullify just such clauses as the Odeco Master Service Contract imposes on Rig Hammers.

While this court has as solicitous a regard for the sanctity of contract between commercial entities as it does for the safety of maritime workers and seamen, it cannot disregard so direct a statement by Congress as section 905(b) of the Act.

■ The court concludes, therefore, that section 9 of the Odeco Master Service Contract is an agreement that directly makes Voison's employer liable to the vessel for the negligent acts of the vessel. Necessarily, the court holds that the Contract is in violation of section 5(b) of the Act and is void.

## D. RIG HAMMERS' OBLIGATION TO INSURE ODECO

Section 8(f) of the Odeco Master Service Contract requires that all insurance policies of Rig Hammers, whether specifically required in the Contract or not, "shall name Company [Odeco] as an additional assured and shall be endorsed to waive subrogation against Company and against all parties for whom Company may be working with the exception of Workman's Compensation insurance ..."

Inasmuch as Rig Hammers' insurance carrier did not respond to the Odeco demands for defense in this action, and as Rig Hammers had not at the time of the trial provided Odeco with copies of the policies required by the Odeco Master Service Contract, Odeco asserts a claim for breach of contract. Accordingly, Odeco seeks to recover for the amount of its settlement with Voison (and presumably the compensation lien), as well as its attorneys' fees in this action.

Odeco claims that this "additional assured" provision stands independent from and is not qualified by any indemnity provision in the Odeco Master Service Contract. While this assertion may be true, its subtle implication—that the additional assured provision is not equivalent to an indemnity provision—requires refutation.

■ The court is of the opinion that Section 8(f) of the Odeco Master Service Contract is, no less than Section 9 discussed above, in violation of the plain requirements and prohibitions of section 5(b) of the Act. It is but another way of requiring that the employer of maritime workers indemnify the vessel for her negligent acts. As such, that clause of the Contract is void as a matter of law and its "breach" by Rig Hammers, if such there be, does not support a claim for damages.

In support of its argument to the contrary, Odeco relies on *Price v. Zim Israel Navigation Co., Ltd.,* 616 F.2d 422 (9th Cir. 1980). This opinion held that section 5(b) of the Act did not make void an agreement between a stevedore firm and a vessel whereby the vessel was to be named as "co-insured" under the stevedore's insurance policies. In that case, the vessel sought to recover directly from the stevedore's insurer when the insurer failed to

honor the "co-insurance" clause of the policies.[3]

That court relied on the legislative history of section 5(b) of the Act in concluding that Congress did not intend to prohibit such co-insurance agreements. By narrowly reading the committee report cited above, the court concluded that section 905(b) was only intended to eliminate *Ryan* esque third-party litigation.[4] The court stated that insurance procurement provisions do not make the maritime worker's employer directly or indirectly liable to the vessel, but simply allocate initially the burden of procuring insurance.

This court cannot agree with that conclusion. Not only do such co-insurance or additional assured provisions make the employer indirectly liable for damages caused by the negligence of the vessel, they work against the express public policy objective of encouraging safety by requiring the vessel to provide a safe workplace. In a situation such as exists here, the vessel has little incentive to provide a safe workplace because she has shifted the cost of failing to do so to the purse of another: the maritime workers' employer.

Should an employer choose to self-insure, the effect of the additional assured provision would be to contractually oblige the employer to bear the costs of the vessel's acts of negligence. An employee injured by the negligence of the vessel could sue the vessel, and recover damages; then the vessel could require the employer, as "insurer" of the vessel, to pay those damages on its behalf. In effect, the agreement would make the employer directly liable to the vessel for those damages.

The additional assured provision of the Odeco Master Service Contract accomplishes the same result *indirectly.* By purchasing liability insurance with a co-insurance clause, the employer of maritime workers pays for the damages caused by the negligence of a vessel in small increments. The premiums, less administrative costs, fill a "risk pool" of funds that eventually are paid out in satisfying claims against negligent vessels.

Regardless of whether the vessel or the employer pays the insurance premiums, the cost of the vessel's negligence is ultimately borne by the buyers of goods moved by sea. This proposition, however, ignores the more important point that the cost of harm ought to be borne by the party that causes the harm. Only by charging the damages at their source can due care be encouraged and negligence discouraged. The more that the costs of negligence are diffused in the economic system, the less is their value as an incentive to the exercise of due care.

The employer of maritime workers enjoys limited liability under the Act while his employees receive a "no fault" form of compensation when injured. Yet the employer has the incentive to avoid negligent behavior because his compensation insurance rates will increase as his claims increase. The better his employees' safety record, the lower his insurance premiums are. If the employer runs an unsafe operation, his pre-

---

**3.** That new versions of indemnification clauses appear a decade after the amendment of the Act gives proof to the expectation that vessels would use their relatively greater bargaining power to circumvent the Act. The House Report noted that "unless such hold-harmless, indemnity, or contribution agreements are prohibited as a matter of public policy, vessels by their superior economic strength could circumvent and nullify the provisions of section 5 of the Act by requiring indemnification from a covered employer for employee injuries. H.R. Rep. No. 1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 4704.

**4.** The committee emphasized the fact that the amendment to the Act foreclosed the possibili-

ty that indemnification, contribution, or hold-harmless clause might be enforced:

Accordingly, the bill expressly prohibits such recovery, whether based on an implied or express warranty. It is the committee's intention to prohibit such recovery under any theory including, without limitation, theories based on contract or tort. Under the proposed amendments, the vessel may not by contractual agreement or otherwise require the employer to indemnify it, in whole or in part, for such damages.

H.R.Rep. No. 1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 4704–05.

722

miums increase with the result that he either increases his charges to vessels or reduces his profits by absorbing the costs himself. In either event, his ability to compete is reduced. Thus, the employer has a real economic incentive to exercise due care and keep his workers safe.

The court believes that section 5(b) of the Act imposes the same financial incentive upon a vessel by making the vessel liable for her acts of negligence which cause injury to maritime workers. Moreover, the utility of this incentive is diluted, although not destroyed entirely, when the vessel requires an employer of maritime workers to bear the cost of the vessel's negligent acts.

The effect of this "additional assured" clause is to put Voison's employer in an irrational and inequitable position: liable for the negligent acts of others as well as for its own.

The rational way of paying for injuries caused by the negligence of a vessel is to require the vessel, directly or through her own insurer, to bear the costs. The frequently negligent vessel is thereby forced to pay ever increasing insurance premiums with the result that her expenses increase and her profits decline. Eventually, the errant vessel is either forced out of business, or forced into providing a safe workplace. This result comports with the intent of the House and Senate committees as expressed in the legislative history of the 1972 amendments to the Act.

The conclusion of the Zim court that co-insurance provisions may serve merely to allocate initially the burden of procuring insurance is not justified on the facts of this case. Despite the wording of section 9 of the Odeco Master Service Contract, the court does not believe that Odeco needs the help of occasional contractors such as Rig Hammers in procuring insurance coverage. Moreover, Odeco appears to have no discernible economic interest in obtaining liability coverage through its subcontractors instead of directly from an insurer.

The court finds that section 8(f), the "additional assured" subsection of the Odeco Master Service Contract, has the effect of making the injured maritime worker's employer liable to the vessel. This shifting of liability from the negligent vessel to the employer of the maritime workers, however cleverly done and under whatever rubric, is contrary to both the letter and the history of section 5(b) of the Act. The court therefore holds that contractual provision to be void and unenforceable against Rig Hammers.

The court's conclusion that the indemnity and the additional assured requirements of the Odeco Master Service Contract are void is consistent with the holdings of this circuit that section 5(b) of the Act prohibits indemnity actions by vessels against employers of maritime workers. *Pippen v. Shell Oil Co.,* 661 F.2d 378, 386 (5th Cir.1981).

Moreover, this policy follows the long-standing reluctance of courts in maritime cases to enforce release-from-negligence-liability clauses in contracts. *The Steamer Syracuse,* 12 Wall. 167, 171, 20 L.Ed. 382 (1871) (notwithstanding a towing agreement, errant tug "must be visited with the consequences" of its own negligence); *The Wash Gray,* 277 U.S. 66, 73, 48 S.Ct. 459, 460, 72 L.Ed. 787 (1928) (damage due to negligence of towing vessel will not be borne by tug despite terms of towage contract); *The Bisso,* 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1956) (reiterating the judicial rule invalidating contracts releasing towers from all liability for their negligence).

As the Court noted in *Bisso,* application of the rule served (1) to discourage negligence by making wrongdoers pay for damages, and (2) to protect those in need of goods or services from being overreached by others who have the power to drive hard bargains. *Id.* at 91, 75 S.Ct. at 632.

Those same reasons apply in the instant case, and although Odeco did not provide needed goods or services to Rig Hammers, the situation is otherwise analogous. Just as the tug is dependent upon the availability of the towing vessel, Rig Hammers is dependent upon access to drilling vessels in order to ply its trade of hammering casing on offshore oil wells.

"It ought to be against public policy to permit a vessel to contract against her own fault. To allow her to do so begets recklessness, carelessness, and neglect." *The Oceania,* 170 F. 893, 896 (2d Cir.1909) (Coxe, J., dissenting). The court believes: that it not only *ought* to be against public policy, but that it *is* against public policy, as expressed in section 5(b) of the Act and its legislative history, for a vessel to contract against her own fault as was here attempted.

### E. THE SETTLEMENT AND THE COMPENSATION LIEN

Odeco agreed by the terms of its compromise with Voison to pay him Voison $75,-000, exclusive of Rig Hammers' compensation lien, as damages for the injury he suffered due to the negligent acts of Odeco's vessel OCEAN PRIDE. As subrogatee of Voison's employer, Rig Hammers, the intervenor, Gray & Co., asserts its equitable lien against the proceeds recovered by Voison for compensation benefits paid to Voison by Gray on behalf of Rig Hammers. The benefits paid to Voison between the date of his injury and his return to work total $45,691.00.

Implicit in Odeco's agreement to pay Voison $75,000 *exclusive* of the compensation lien is the obligation to pay off the compensation lien itself. In other words, Odeco is liable for a total amount of $120,-691.00 for its negligence in causing the injury of Voison onboard the OCEAN PRIDE.

Since Voison agreed to the amount of damages, the court concludes that $75,000 is an adequate and fair award to Voison above and beyond his employer's compensation lien for injuries he sustained May 2, 1979 aboard the OCEAN PRIDE.

Having noted the settlement between the parties, the court enters judgment for the Plaintiff, Andrew Voison, in the amount of $75,000 against O.D.E.C.O. Drilling, Inc.

Judgment is entered for third party defendant Rig Hammers, Inc. and intervenor Gray & Co. against O.D.E.C.O. Drilling, Inc. in the amount of $45,691.00.

O.D.E.C.O. Drilling, Inc. is neither entitled to indemnity from Rig Hammers, Inc. nor entitled to status as an additional assured under the insurance policies of Rig Hammers, Inc.