**Kenneth BROWN, Jr., Plaintiff,**

v.

**CLIFF'S DRILLING COMPANY, Defendant.**

**No. B–85–1717–CA.**

United States District Court,
E.D. Texas,
Beaumont Division.

July 1, 1986.

Rawleigh Newman, Lake Charles, La., for plaintiff.

F. Willaim Mahley, Ross Griggs & Harrison, Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HALL, District Judge.

Plaintiff, Kenneth Brown, Jr., brought this claim against the Defendant, Cliff's Drilling Company, under the Jones Act and General Maritime Law, alleging that he was injured in an accident caused by the negligence of the Defendant Drilling Company and the unseaworthiness of the Defendant's barge—Cliff's Barge Rig No. 2. The Court now makes the following Findings of Fact and Conclusions of Law:

## STIPULATED FACTS

1) This Court has jurisdiction over the parties and subject matter of this suit, and venue in this District is proper.

2) Plaintiff was an employee of the Defendant on the date of the alleged accident on Cliff's Barge Rig No. 2, to-wit, June 24, 1985.

3) Cliff's Drilling Company, the Defendant, was the owner of the rig—Cliff's Barge Rig No. 2.

In accordance with Federal Rules of Civil Procedure, Rule 52(a), this Court finds the facts specially as set forth in the following Findings of Fact (hereinafter called Findings) and states the following Conclusions of Law (hereinafter called Conclusions). To the extent if any of the Findings as stated reflect legal conclusions, they shall be deemed Conclusions; to the extent if any of the Conclusions as stated reflect factual findings, they shall be deemed Findings.

### FINDINGS OF FACT

1) On June 24, 1985, Cliff's Barge Rig No. 2 was located off the coast of Pt. O'Connor, Texas. At such time the Plaintiff, Kenneth Brown, Jr., was employed aboard said rig as a roughneck floorman.

A) The hereinafter mentioned accident occurred just before daylight hours on June 24, 1985, at a time when the rig was well-lighted.

2) On June 24, 1985, the Plaintiff, Kenneth Brown, Jr., sustained a fracture of the medial femoral condyle, one of the knuckle-like protrusions of the bottom end of the thigh bone. The injury occurred when the spinning tongs, which the Plaintiff and another of Defendant's employees were in the process of hanging, fell upon the Plaintiff. The tongs in question are a very heavy metal device used to manipulate drill pipe during drilling operations, and are hydraulically operated. The tongs in question were estimated to weigh between 350–450 lbs. and were too heavy for two men to pick up. The tongs are hung on one end of a cable which runs through a pulley in the derrick and back down to the rig floor where it is connected to a counterweight bucket. The counterweight bucket moves vertically along a track depending upon the height adjustment of the tongs. The tongs themselves can be adjusted vertically and can also be moved away from the hole during drilling operations. When the rig is stacked and the derrick is lowered, it is necessary to disconnect both ends of the cable from the tongs and weight bucket. The tongs should be removed because they cannot ride with the derrick as it is lowered. The tong end of the cable should be secured to some part of the derrick leg to keep it secure when the derrick is being lowered and raised. The tongs were tied to the weight bucket by a sash cord and were not tied to any part of the derrick leg. Safety meetings were held on Cliff's Drilling Barge No. 2, but only after accidents occurred. (Leger Deposition Pg. 45, Line 1 to Pg. 47, Line 13.) There was no instruction or training given to the workmen by supervisory personnel at the time of the accident. (Testimony of Brown; Monceaux Deposition Pg. 9, Line 21; Pg. 16, Line 1; Pg. 17, Line 7.)

3) The Court adopts that portion of the testimony of Steve Monceaux (who is a roughneck and a witness to the accident), who testified that shackling off is the best way to tie off the tongs and that he knows now that a sash cord is not the best way to tie off tongs.

4) The Court finds that there was no supervision at the time of the accident. (Leger Deposition Pg. 22, Line 7.)

5) The Court finds that the weight bucket was attached to the cable with the sash cord; that the sash cord was not accounted for and was not produced at trial.

6) The Court finds that the Plaintiff, Kenneth Brown, Jr., connected the tongs to the air hoist line. Plaintiff's co-worker, Steve Monceaux, raised the tongs with the air hoist to the height of the end of the cable. After Plaintiff Brown had connected the tongs to the air hoist line, he directed Monceaux to slacken the air hoist, at which time the tongs dropped until they were approximately six feet from the floor. When the tongs did not reach the rig floor, the Plaintiff (who was standing on the tongs) began jumping up and down on the tongs, seeking to get them to drop further, or closer, to the floor. When this did not work, he stepped down to the derrick floor and started pulling on the tongs, at which

time the sash rope broke and the tongs fell to the floor injuring Plaintiff's leg.

Plaintiff was taken on a crew boat to Pt. O'Connor where he was seen in the emergency room at Champ Traylor Hospital. Later, he was admitted to the emergency room at the St. Patrick's Hospital in Lake Charles, Louisiana. He was seen at St. Patrick's by Dr. Lynn Foret, who diagnosed the fracture and performed surgery on Plaintiff's leg. The cast on the leg was removed in August, 1985, and Dr. Foret continued following Plaintiff Brown's condition.

7) Plaintiff Brown attended the fall, 1985, semester at McNeese State University in Lake Charles.

8) Plaintiff Brown progressed well until December 27, 1985, when Dr. Foret observed that Brown had debris present in the knee joint and some chrondomalacia changes taking place, coupled with medial joint line tenderness. Although Brown and his wife had moved to Plano, Texas, Plaintiff Brown returned to Dr. Foret for an arthroscopic debridement of the joint, medical condyle shaving, and shaving of the medial meniscus through all three zones, in January, 1986.

9) Dr. Foret saw Brown again on January 31, 1986, for follow up from the arthroscopy and Dr. Foret noted that Brown had done very well. Foret removed the sutures and noted that Brown would begin slowly ambulating and get into physical therapy for about six to eight weeks. Regarding Brown's work status, Dr. Foret noted that Brown should be able to get back to full duty status over the next two to three months. (Dr. Foret Deposition Pg. 36, Line 17 to Pg. 37, Line 9). Dr. Foret last saw Brown on March 7, 1986, when he noted that Brown had done "beautifully", but lacked 7° of full extension and about 125° of full flexion. He noted that the work status was unchanged.

10) Plaintiff contends that he cannot return to oilfield work. It was disputed whether or not the Plaintiff had intended to make a career in the oilfield or return to school and obtain a teaching certificate.

The Court finds that (with reference to Plaintiff's alleged damages) Plaintiff was seen playing tennis in Dallas, and was also observed ice skating and running back and forth playing football.

11) The Court finds that the Plaintiff was born on November 20, 1960, and was twenty-four years of age at the time of the accident. Plaintiff was working for Cliff's Drilling Company, earning $8.35 per hour, working 12-hour days, seven days on and seven days off. This figure does not include benefits provided to the Plaintiff by the Defendant.

12) Plaintiff started work for Defendant in the early part of 1984 and earned $19,042.00 in 1984—he worked the first six months of 1984 as a roustabout and the last six months of 1984 as a roughneck. The Court finds that the Plaintiff worked from January 1, 1985, through June 24, 1985, for the Defendant, Cliff's Drilling Company, and earned $12,082.00 for that period of time.

13) The Court accepts the testimony of Dr. Jan Warren Duggar that the Plaintiff's lost earnings from the date of the accident to the time of trial amounted to $17,490.00.

14) The Court finds that the Plaintiff has received the injuries described elsewhere in the opinion, but that those injuries will not be totally disabling. Plaintiff Brown will be able to return to work as a coach, or teacher/coach.

Warren Duggar, the Plaintiff's expert witness regarding economic loss, testified that according to his calculations Brown would lose $295,000.00 over his lifetime because of his inability to work in the oil field as a roughneck if he instead became a teacher. For a number of reasons, the Court is not persuaded by the figures and rationale offered by Duggar.

First, Duggar's figures assume that it will take Brown three years to complete his education and become certified as a teacher. However, Brown himself said it would only take him two years to finish school. On cross-examination Duggar said that his figures did not take that new time into

account. Further, Duggar did not include into the projected salary for a teacher the supplemental pay that most coaches receive. The Plaintiff had testified that he wanted to be a coach. Duggar also made his assumptions based on what he felt was the average starting salary for teachers in Louisiana. However, Duggar admitted that teachers elsewhere make more money.

Neither did the Plaintiff's expert assume *any* income for the three years he thought it would take the Plaintiff to finish school. However, other testimony demonstrated that the Plaintiff had worked during his scholastic career. The medical testimony also established that Brown could return to some kind of employment immediately. While Duggar had included the value of fringe benefits in totalling Brown's oil field pay and projected lifetime earnings, it appears Duggar *did not* include the value of fringe benefits accruing to a teacher, such as health insurance, life insurance, retirement allowances, and the ability to hold gainful employment during the summer recess. Moreover, while he disagreed with the findings, Duggar did acknowledge the existence of a study that showed oil field workers often did not make a career out of that work, instead they usually worked in that field less than ten years before moving to other occupations. Consequently, no future wage loss is to be awarded.

15) The Court finds that the Plaintiff's medical bills have been paid.

16) On redirect examination Dr. Foret declined to state, with any degree of medical certainty, the extent, if any, of possible future medical problems to be associated with this injury. (Foret Deposition Pg. 35, Line 17 to Page 36, Line 10.) While Dr. Foret said Brown probably will have some problems with the knee, and that his joint would never be perfect again, he also said "so he's got some trouble with the knee joint, the extent of which is … could worsen with time and could get a little better with time, so there's no way of really telling". (Ibid, Page 36, Lines 5–9.) Because of the highly speculative nature of the testimony, the Court will not render an award for the cost of future medical treatments, if any.

17) The Court finds that the Plaintiff has sustained damages of Sixty-Seven Thousand Five Hundred Dollars ($67,500.00) for pain, suffering, and mental anguish from the date of the accident to the date of judgment. Further, that the Plaintiff will sustain future pain, suffering, and mental anguish damages in the amount of Thirty-Five Thousand Dollars ($35,000.00).

District Courts have wide latitude in awarding damages. *Hyde v. Chevron USA, Inc.*, 697 F.2d 614, 632 (5th Cir.1983). An amount awarded for pain and suffering depends to a great extent on the trial court's observation of the Plaintiff and the Court's subjective determination of the amount needed to achieve full compensation. *Sosa v. M/V Lago Izabel*, 736 F.2d 1028, 1035, 1986 A.M.C. 1426 (5th Cir.1984). The determination of the amount necessary to achieve full compensation for pain and suffering is inescapably at least partially subjective. *Parks v. Dowell Division of Dow Chemical Corp.*, 712 F.2d 154, 160 (5th Cir.1983).

18) The Plaintiff testified that there were no supervisory personnel in the vicinity of the work floor at the time of the accident. Travis Leger testified that the proper procedure for "rigging-up" wasn't given at safety meetings, and testified that no specific training of any kind was provided to employees of Cliff's Drilling. "I just assumed people knew what to do", Leger testified that he assumed people knew what to do. In the Fifth Circuit the law is clear that a seaman has only a duty of slight care. *Thezan v. Maritime Corp.*, 708 F.2d 175, 1985 A.M.C. 1278 (5th Cir. 1983) cert. denied 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984). Further, that is reversible error to hold or instruct otherwise. *Brooks v. Great Lakes Dredge-Dock Company*, 754 F.2d 536 (5th Cir.1985), modified 754 F.2d 539 (5th Cir.1985). The Plaintiff had only hung tongs three to five times before and followed what was his normal procedure in doing the job. If the tongs were stuck something had to be done

to free them. With no instruction in safety procedures, and no supervision, Brown did what seemed reasonable. The Court finds the Plaintiff was not contributorily negligent.

## CONCLUSIONS OF LAW

 It is plain and settled law that a ship owner owes an absolute and nondelegable duty to seamen to furnish a vessel that is reasonably safe and fit for its intended purpose. *Ceja v. Mike Hooks, Inc.,* 690 F.2d 1191, 1985 A.M.C. 2981 (5th Cir. 1982); *Webb v. Dresser Industries,* 536 F.2d 603, cert. denied 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (5th Cir.1977). Further, that a cause of action arises for a breach of that duty, even though the unseaworthy condition was unknown to the owner of the vessel. *Webb v. Dresser Industries,* supra at 606. Yet, it is clear that in this case the defect was known, at least to supervisory personnel of Cliff's Drilling. (Leger Deposition, Pg. 35, Lines 11–22.) By failing to warn of the danger, Travis Leger, the driller, created an unseaworthy vessel. *Verrett v. McDonough Marine Service,* 705 F.2d 1437 (5th Cir.1983). The law is also clear that evidence of even the slightest negligence is sufficient to sustain a finding of Jones Act liability. 46 U.S.C. § 688. *Davis v. Hill Engineering, Inc.,* 549 F.2d 314, 329 (5th Cir.1977). Far more, however, is involved in the Court's finding of unseaworthiness than Leger's silence regarding the danger posed to Brown and Monceaux by the sash cord.

 It is well known that one creates an unseaworthy vessel by utilizing an understaffed, or ill-trained, crew. *American President Lines Limited v. Welch,* 377 F.2d 501 (9th Cir.1967), cert. denied 389 U.S. 940, 88 S.Ct. 294, 19 L.Ed.2d 202 (1967); *Voisin v. O.D.E.C.O. Drilling, Inc.,* 557 F.Supp. 715 (E.D.TX, 1982) reversed on other grounds, 774 F.2d 1174 (5th Cir.1984), cert. denied sub nom.; *Rig*

*Hammers, Inc. v. Odeco Drilling Co.,* —— U.S. ——, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985). Leger testified that the crew was short-handed that night. (Deposition of Leger, Pg. 22, Line 1.) Indeed, even though Brown was the "experienced" hand that night his supervisor still considered him "worm" in many respects.[1] (Deposition of Leger, Pg. 41, Line 2.) There had never been any instruction or training regarding the rigging-up process, according to the testimony of the Plaintiff, who had only hung tongs three times. (See also: deposition of Monceaux Pg. 16, Line 1 to Pg. 17, Line 7; and Deposition of Leger, Pg. 46, Lines 20–24.) By not training, instructing, or supervising the employees, Cliff's Drilling had created an unseaworthy condition and that unseaworthy condition was one of the causes of the Plaintiff's injuries. The only requirement under the Jones Act is that the seaman be doing the work of his employer pursuant to the employer's orders. *Crafton v. Tennessee Val. Sand and Gravel Co.,* 408 F.2d 1096 (5th Cir.1969), cert. denied 396 U.S. 827, 90 S.Ct. 73, 24 L.Ed.2d 78 (1969). This because the duty to provide for a safe work environment and course of conduct lies primarily with the employer. *Ceja v. Mike Hooks, Inc.,* 690 F.2d 1191, 1985 A.M.C. 2941 (5th Cir.1982).

Accordingly, IT IS, THEREFORE:

ORDERED, ADJUDGED and DECREED that the judgment is for the Plaintiff and against the Defendant in the aggregate amount of ONE HUNDRED NINE THOUSAND NINE HUNDRED AND NINETY DOLLARS ($109,990.00), plus prejudgment interest to be computed at the current federal interest rate of 7.03% from the date of the accident to the day of judgment, compounded daily; all costs to be assessed against the Defendant.

---

1. Worm is a term of art, used in the trade to describe a new employee, one who has not yet mastered his duties. It should also be noted that Monceaux had only the slightest experience in the oil patch, and that it was his first tour of duty with Cliff's Drilling Company. He was a novice.